Filed 8/3/16  P. v. Andrade CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B262569 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA414814) |
| v. | |
| ARTHUR ANDREW ANDRADE, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  George G. Lomeli, Judge.  Affirmed.

Mark Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Arthur Andrew Andrade, Jr. (defendant) appeals from his conviction for murder. He contends that the trial court erroneously read CALCRIM No. 852 to the jury, refused to give defendant's proposed pinpoint instruction, and that the judgment must be reversed due to the cumulative effect of the alleged errors. As we find no merit to defendant's contentions, we affirm the judgment.

## BACKGROUND

Defendant was charged by indictment with the murder of his wife, Esperanza, in violation of Penal Code section 187, subdivision (a),[1] and with disobeying a domestic relations court order, in violation of section 273.6, subdivision (a). The indictment also alleged that defendant had personally used, and personally and intentionally discharged a firearm, causing great bodily injury and death to Esperanza, within the meaning of section 12022.53, subdivisions (b) and (c).

Defendant pled no contest to the violation of court order, and a jury found defendant guilty of the murder in the first degree, and found true the three firearm allegations. On February 23, 2015, the trial court sentenced defendant to prison for 25 years to life, plus a consecutive term of 25 years to life due to the firearm enhancement alleged under section 12022.53, subdivision (d). The court imposed additional consecutive firearm enhancements of 10 years and 20 years, and stayed the terms pursuant to section 654. Defendant was given 144 days of presentence custody credit and was ordered to pay fines, fees, and restitution. Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

Esperanza was killed on March 16, 2013, while sitting in her car in the parking lot of the Montebello restaurant where she worked, after defendant shot her six times in the head while holding the gun about six to eight inches away. The shooting was captured on the restaurant's surveillance video and shown to the jury. Eyewitness Martha Quintanar testified to having heard a gunshot and then observing a man she identified as defendant

---

[1] All further statutory references in this Background section are to the Penal Code, unless otherwise indicated.

2

across the street, standing by a car. After the first gunshot and a pause, defendant then fired into the car five or six times in rapid succession.

Esperanza arrived at 8:00 a.m. to ride with another employee, Carlos Granados, to the Santa Ana restaurant to cover a coworker's shift. Granados testified that he was carrying supplies to his truck, when he saw that his truck was blocked by an untended, unfamiliar car with its engine running. Granados then heard a scream and gunshots, saw defendant put something into his rear waistband, get into the running car, and speed off, tires squealing. Another employee noted the license number of the car, which was later traced to defendant's friend Karla Santacruz (Santacruz), who had earlier exchanged cars with defendant.

Defendant's photograph appeared on television news that evening, and defendant turned himself in the next day. A forensic examination revealed that all of the casings and fired bullets recovered from both the scene and the coroner came from defendant's legally owned .40-caliber Glock handgun. An examination of the gun revealed that it had safety features which prevent accidental firing, and that each trigger pull would require six and one-quarter pounds of pressure.

**Defense evidence**

### Testimony of family members

Defendant's sister, Shelly Melendez (Melendez), his mother Daisy Sarmiento (Daisy), his uncle Vincent Sarmiento (Vincent),[2] and extended family relative Luis Carlos Valenzuela, all testified about defendant's troubled relationship with Esperanza and his emotional state during their many separations. Defendant suffered severe depression for which he was prescribed medication. He did not eat or sleep well, was anxious and shaky, had trouble focusing, cried uncontrollably at times, and often lay in

---

[2] Melendez was the older of defendant's two sisters. His younger sister was Daisy Sarmiento, and their parents were Daisy Sarmiento and Arturo Sarmiento, Sr. Vincent testified that defense counsel was his brother-in-law, married to his sister. Defendant's mother testified that she was defense counsel's sister-in-law. As several family members mentioned at trial shared the surname Sarmiento, we refer to them by first name, intending no disrespect.

bed in a fetal position. Sometimes his eyes would roll to the back of his head. Vincent testified that defendant was obsessive about his love for Esperanza, about winning her back, and about preventing their marriage from failing. Though concerned that defendant was suicidal, he never heard defendant express any desire to hurt Esperanza. Melendez testified that defendant seemed desperate to get Esperanza back.

Daisy testified that defendant and Esperanza lived with her during their first year of marriage. Daisy often heard their arguments, which included profanity, and sometimes damage to the house, some of it caused by Esperanza. Esperanza sometimes used profanities toward defendant in Daisy's presence, often telling defendant to "shut the fuck up," and calling him a loser, fucking idiot, good for nothing, and dog. Esperanza would often leave defendant and then return. Once, defendant arrived at Daisy's house at 3:00 a.m., claiming that Esperanza sent him away because he had a toothache. After the couple separated in late January 2013, defendant came to live with Daisy. On Valentine's Day 2013, Esperanza drove defendant to Daisy's house. When they arrived, defendant looked distraught, and Daisy saw torn flowers, a card, and $20 dollar bills scattered on the back seat of the car. When defendant drew close to Esperanza, pleading with her to save their marriage, she pushed him and said, among other things, "You get out, you piece of shit." On February 23, Daisy, Arturo, and Melendez met Esperanza and defendant at a restaurant, where Esperanza told the family that she wanted to leave the marriage and be left alone. Defendant pleaded with her, told her that the family was going to give him the business and buy them a house. On February 25, defendant was prescribed Xanax and the antidepressant Wellbutrin. Defendant remained anxious, inconsolable, and did not sleep. A few days later defendant's sister received a copy of a protective order obtained by Esperanza, which Daisy gave to defendant. Daisy last saw defendant on March 15, the day before the shooting.

### *Defendant's testimony*

Defendant, 31 years old at the time of trial, testified that Esperanza was a student, five years younger, about 20 or 21 years old when they first met. At that time he was attending the police academy, but failed to finish the program, and went to work at a law

4

firm while attending college. The two married in March 2011, though defendant did not feel ready. He thought they should both finish their degrees and become more financially sound first, but Esperanza was insistent. Although Esperanza was an undocumented immigrant, and believed marriage would help her become documented, defendant did not think that this was her motive to marry early. He loved her, and thought she loved him.

The couple lived at Daisy's house, rent-free for about six to eight months, but Esperanza was not happy there, and would periodically leave him and return. Esperanza would call defendant a "a fucking loser," and a "fucking idiot," and tell him that his family treated him "like a dog." Esperanza would also use profanity in front of his mother. Once Esperanza said that she wished his six-year-old daughter, who visited occasionally, would be raped and killed. Defendant regretted that he tolerated such talk without telling her to stop.

Esperanza wanted more privacy, and complained that his family did not buy them a house as they did for his sister when she married. Defendant then spoke to his father, and Arturo partitioned his house and remodeled the kitchen to give them a two-bedroom home to themselves. Defendant and Esperanza still had problems. Esperanza would become upset and break things, such as windows, his laptop, the television, and his statistics calculator, and once cut up his clothing and spare work boots because she was angry that defendant woke her up to ask where to find his work jacket. When he woke her, she said "You fucking asshole. You fucking woke me up." Eventually, Esperanza moved to Los Angeles.

During a separation in September 2012, Esperanza went to a women's retreat and gave defendant an ultimatum to go to the men's retreat or the marriage would end. Defendant did as she asked, but Esperanza did not return to him, making him sad. Defendant broke down, and his aunt took him to a hospital, where he was prescribed medication. Defendant and Esperanza reunited in November 2012, and lived in her apartment in Los Angeles until early January 2013, despite Esperanza continuing to be angry, and occasionally "kick[ing] [him] out." About once a week defendant slept in his

5

car.  One time, when his infected tooth kept him awake, she called him a "pussy," told him to quit whining, and then evicted him.  He moved back to Orange County.

In January Esperanza told defendant she was pregnant and happy, and that she had a name picked out for the baby.  In late January, however, Esperanza lost the baby and blamed defendant.  When she ignored his text messages asking whether she was okay, she replied in Spanish:  "Stupido, don't pretend you fucking care or wanted it.  What is this, a game?  You want it and then you don't and then you do.  D.T.E. You fucking crazy.  Go fuck yourself, asshole.  I am not pregnant anymore.  That is what you wanted.  Okay.  Will be better when you stop playing that stupid fucking role of a caring guy when a day ago you were worse than a fucking animal.  At least dogs are loyal and show affection.  You died to me when my child died, and stop texting."  She also texted:  "I hate you.  You are a bad, evil person"; "I will never forgive you.  You understand?  What you made me feel and how you behaved towards me and your child is something I will never forgive you for.  I know you forget your promises, but you said you would leave me alone, continue your life."

Defendant denied that he did not want the baby, or that he had wanted Esperanza to terminate the pregnancy.  Instead he claimed that the pregnancy surprised and stressed him, but he was also happy and wanted Esperanza to move to Orange County.  Over the next few days defendant continued to text Esperanza, despite her requests to leave her alone, because he wanted to know whether she had a miscarriage or an abortion.  In their back-and-forth text conversations during the last few days of January, Esperanza told him, amid much profanity, that she would never return to him, would divorce him, would call his family or the police if necessary, and that she hated him with all her heart.  Eventually, she texted that she had an abortion, adding, "Happy?  Now go fuck yourself."  Defendant did not believe her claim to have had an abortion, and replied, "I don't think you did.  You are too religious." [3]  Defendant sent many other texts to Esperanza during that time alternating between asking for a reconciliation and expressions of anger.  For

---

[3]    The parties stipulated that Esperanza had a miscarriage on January 23, 2013.

6

example, he sent texts such as: "All I want is your happiness"; "I was stressed you did the act" (meaning the abortion); "I feel horrible still;" "Screw you"; "I'm here if you feel sad"; "I need answers. You are too impulsive"; "I hate you. We are divorcing. No way back"; "I just want to help if you did or didn't"; "You never include me"; and "What can I do for you?"

On January 29, Esperanza texted she would get a restraining order if he did not leave her alone. Her other final texts included: "I hate you and will do everything in my power to sabotage this marriage. . . . If you fucking dare to go anywhere near me, I am calling the cops. I swear on this baby that wasn't born"; and "I do hate you with all my heart. I swear to god I hate you so much and don't want to fucking see you ever again. I am going to start dating and remaking my life. I suggest you do the same." Defendant replied: "If anything, you had a miscarriage." Interspersed with additional insults and profanity from Esperanza, defendant assured her that he loved her and would always love her. Esperanza then changed her phone number.

In February, defendant was distraught, felt like a failure and an idiot, and thought he should have tried harder. On Valentine's Day, in an effort to reconcile, he optimistically went to Esperanza's workplace with flowers, a card, and money. She was annoyed and disgusted, insulted him, calling him a coward and pathetic. She ripped up the flowers and threw down the card and money. The next day he felt worthless, like a failure. A week later, defendant visited a psychiatric facility in Pasadena, but remained depressed.

Defendant testified that he loved Esperanza and had not given up, so on February 22 or 23, he went to Esperanza's workplace again to see if they could fix things. He asked her to go with him to talk to family at a restaurant in Orange County. On the way, Esperanza began hitting him, causing him to swerve, and he was pulled over by the Highway Patrol. The officers tested him for alcohol, then let him go. Later, at his father's house, defendant pleaded with Esperanza on his hands and knees. A few days later, he was served with her restraining order. Defendant was severely depressed, did not want to live, and felt "borderline suicidal."

Defendant testified that during the summer of 2012, while separated from Esperanza, he dated Santacruz without telling her that he was married. When Santacruz found out that he was married, she broke off their relationship. In late February or early March 2013, people were advising him to move on, so he reconnected with Santacruz, but denied ever having sex with anyone during his marriage. A few days before the shooting, while defendant was still feeling suicidal, he exchanged cars with Santacruz to have her tires fixed and the oil changed. He had the loaded gun he purchased for the police academy.

The night of March 15, while defendant still had Santacruz's car, he was depressed, sad about the abortion or miscarriage, suicidal, and felt like a failure. Defendant took Wellbutrin and Valium, and drank approximately eight beers to work up the courage to kill himself. When he arrived at Esperanza's workplace on the morning of March 16, he knew he was in violation of the restraining order, that there were security cameras, and that there would be other employees there. He wanted Esperanza to talk him out of committing suicide, and took the gun to show her he was serious, that he really wanted to kill himself. However, he put the gun in his waistband under his shirt, and then parked where Esperanza could not see him. When she did see him, she rolled down her car window and said, "What the fuck are you doing here?" He replied, "We need to talk. What is going on?" Raising her voice, Esperanza reminded him of the restraining order, and said, "Get the fuck out of here." When defendant persisted, she told him, "Back off. I met someone else," and when defendant did not believe her, Esperanza replied: "I only married you for my fucking papers, you fucking idiot. I never fucking loved you"; "I wish you would fucking kill yourself, you fucking idiot . . . , you don't have the fucking balls." Then, when defendant asked whether she had an abortion or miscarriage, Esperanza replied, "It was an abortion, you fucking idiot. Don't worry about it. I was fucking someone else. Wasn't even yours."

Esperanza's statement that the baby was not his was "too much" for defendant. Her infidelity made him angry, and "pushed [him] over the cliff" such that he "lost it," pulled out his gun, aimed it toward her, and shot her without thinking. He denied that he

8

paused between the first shot and the remaining shots, and denied that he had intended to kill her. Defendant claimed he sped away because he panicked, and once away, he drove around looking for a place to kill himself. By the time he was booked into jail, however, defendant no longer felt the desire to kill himself.

During cross-examination defendant was asked to explain the action in the video of the conversation at Esperanza's car and then the shooting. Defendant walked directly to Esperanza's car and as Esperanza was rolling down her window, she told him to get away, that there was a restraining order. Defendant explained that the video showed him looking around throughout their entire conversation, because it embarrassed him to think any nearby people would see Esperanza yelling at him. The video showed defendant open Esperanza's car door and wave his arms about, a gesture defendant explained as asking Esperanza whether she wanted to talk inside the restaurant. The video then showed Esperanza's hands moving in an apparent effort to put on her seat belt, as defendant continued to look about the area. Defendant looked around again as he moved his hand toward his back waistband and pulled out his gun.

*Expert testimony*

Defendant called forensic psychologist, Scott Fraser, who testified about human stress reaction patterns, which can be triggered when the body reacts chemically to threats of physical danger, internal emotional distress, rejection, and hurtful words. Dr. Fraser explained that this activates the nervous system and leads to physiological changes which can result in an irrepressible automatic response, such as panic, freezing, flight, or attack. In some cases, an alarm reaction pattern can lead to a "behavior cascade"; for example, a frightened person might continue to attack an assailant who has ceased to be a threat, as when officers fire many more shots than necessary. However, research has shown that any pause during such a shooting would rarely happen. Dr. Fraser was asked to assume that an emotionally vulnerable man had suffered a progression of hurtful words over a period of two months, and when he asked his loved one whether she had a miscarriage or an abortion, she replied, "I told you it was a fucking abortion. Don't worry about it. It wasn't even fucking yours. I was fucking somebody else behind your

9

back, you fucking idiot." Dr. Fraser then opined that being insulted over a period of months or years can lower the threshold for experiencing a human alarm reaction, but not everyone would fight or kill in response to similar words. Such a person would be most likely to do so if trapped or cornered by a dangerous and stronger force.

Forensic psychiatrist Ronald Markman interviewed defendant on two occasions and reviewed defendant's medical records from 2012 and 2013, as well as family interviews, the text messages, and the video of the shooting. Based on such review, it was Dr. Markman's opinion that defendant was suffering from a major depressive disorder that impacted his self-esteem and his self-perception. He testified that severely depressed people may display poor judgment and behavior that is impulsive and unpredictable, and sometimes, but not always, such a person becomes suicidal. Dr. Markham also diagnosed defendant with a personality disorder due to his impulsive and self-destructive personality traits, as well as with an adjustment disorder with disturbance of emotions and conduct. He explained that a disturbance of conduct referred to an abnormal response to stress, such as killing someone. If defendant was suicidal, sleep-deprived, and had self-medicated with alcohol and Valium at the time of the shooting, this could have worsened his condition. The repetition of hostile, hurtful, or provocative words during a period of time prior to the shooting could have made defendant somewhat more emotionally susceptible to such words, but Dr. Markham thought that new or different hurtful information would have had a more significant effect on defendant's behavior. Given defendant's condition, Esperanza's claim that she never loved him, married him only for her immigration papers, and that she wished he would kill himself but thought he lacked the "fucking balls," could have been significantly hurtful if that was the first time she had said them. Adding a claim to have had an abortion and to have been "fucking somebody else behind [his] back," if newly asserted or different from prior hurtful statements, could have produced uncontrollable behavior. In Dr. Markham's opinion, pulling out the gun and firing multiple shots at Esperanza's head was consistent with the behavior of someone who was uncontrollably emotionally distressed.

10

**Rebuttal**

On February 23, 2013, Los Angeles County Deputy Sheriff Rene Perez contacted a frightened-looking Esperanza outside her apartment in East Los Angeles, where Esperanza agreed only to talk inside her locked apartment with the blinds closed. Esperanza said she was afraid of her husband, and when his car was pulled over the night before she had been afraid to alert the officer. She asked the deputy not to pursue the matter, but accepted his offer of an emergency protective order to keep defendant away from her.

Esperanza's cousin, Alejandra Chavez, testified that she knew defendant before he and Esperanza started dating. Chavez recounted an incident in June 2012, when she, Esperanza, and Esperanza's sister Gabby (Chavez's roommate) spent the day together for Esperanza's birthday. During lunch at a restaurant, defendant telephoned Esperanza more than 10 times. He repeatedly called again on the drive back to Chavez's home, and Esperanza put the call on speaker. Defendant sounded upset, and Chavez heard him say, "You need to go home. You need to go home." Esperanza asked him to let her be with her sister and cousin, and said that she would call him when they reached her cousin's home. Defendant replied, "I need you to get home because I'm hungry and you need to come home and cook." When Esperanza said she would come home "in a little bit," he called her "bitch" and "ghetto," and said, "You need to do what I tell you," and, "I'm your husband and you're my wife. And you need to come home now." A few times he called her "motherfucker," said that he was better than she was, and told her, "If you don't want things to get worse, you need to come home with me now." Chavez did not hear Esperanza use any profanity while speaking to defendant during those calls, and in general Chavez did not know Esperanza to use profanity, except occasionally when she was really upset. Because Esperanza appeared to be upset and frightened, and did not want to go home, she spent the night with her cousin and sister. The last time Chavez saw Esperanza was the day before her death. Esperanza said she wanted a divorce, but defendant did not, and would never let her have one, and that defendant had said he was the only man she could be with.

Esperanza's close friend and coworker Frida Laguna recounted a December 2012 incident after a Christmas gathering at work for employees and family members. Laguna was driving to an Applebee's restaurant with Esperanza in the seat behind her. First Laguna stopped at her cousin's house, where they saw defendant waiting in a car at the corner. Esperanza remained in Laguna's car and defendant did not get out of his car, but when they continued on to Applebee's, they saw defendant's car following them. Defendant drove erratically, tailgating Laguna's car, moving to the front, then to the back, and to the front again, going all around her car for about 15 minutes until they approached the restaurant.

At the restaurant, Esperanza seemed afraid to get out of the car, but Laguna did not see defendant park and thought that he had left. Once inside, however, Esperanza appeared flustered and afraid, and said that she could see defendant outside. Laguna accompanied Esperanza outside to talk to defendant. Defendant was loud and aggressive, telling Esperanza that she was a married woman, did not belong there drinking and doing these things. He said, "You need to go home with me now," and "We need to go. We need to leave." Esperanza did not go with him, and was crying as they went back inside, where they stayed for about an hour. Esperanza appeared panicky and afraid to go home, but hoped defendant might be less aggressive since relatives were visiting, and feared that not going home might make him worse. Laguna walked her to the door, where defendant grabbed her by the arm and pulled her inside.

Laguna and Esperanza met for coffee in February 2013, when Esperanza was sad and depressed about losing the baby, but pleased she had received her immigration documents, and had plans to enroll in school. Esperanza said she wanted a divorce, but defendant would never divorce her. She was afraid of defendant and did not want to be alone, so Laguna was with her as much as possible, even over night at least twice. To prevent defendant from contacting her, Esperanza changed her phone number and closed her social media accounts.

12

## I.  CALCRIM No. 852

### A.  *Defendant's contentions*

Defendant contends that the trial court erred in instructing the jury with CALCRIM No. 852, and that the error violated his right to due process by negating his heat of passion defense.[4]  The prosecutor requested the instruction after presenting Laguna's testimony regarding the drive to Applebee's restaurant.  After a lengthy discussion about whether defendant's driving during the incident came within the definition of domestic violence, the trial court found that it did, and agreed to give the instruction.

Defendant bases his assertion of error on three grounds, which he states as follows:  "CALCRIM No. 852 prejudicially violated appellant's right to due process [1] by invading the province of the jury, [2] lowering the state's burden of proof, and [3] by improperly permitting the jury to infer from a single uncharged, relatively innocuous driving incident that appellant was 'likely to commit and did commit murder.'"

### B.  *Underlying legal principles*

CALCRIM No. 852 concerns the application of Evidence Code section 1109, explaining the burden of proof and the correct use of propensity evidence, admitted under authority of that statute.  (See *People v. Reyes* (2008) 160 Cal.App.4th 246, 251-252.)  Evidence Code section 1109 provides that when a defendant is accused of an offense involving domestic violence*,* evidence of the defendant's commission of another domestic violence offense may be admitted to show a propensity to commit such crimes, so long as the evidence is not inadmissible under Evidence Code section 352.  (See Evid. Code, § 1109, subd. (a).)[5]  "'Domestic violence' has the meaning set forth in Section

---

[4]     "[A] a killing during a sudden quarrel or  heat of passion, is not a defense but a crime; more precisely, it is a lesser offense included in the crime of murder."  (*People v. Breverman* (1998) 19 Cal.4th 142, 159, italics omitted; § 192, subd. (a).)

[5]     In relevant part, Evidence Code section 1109, subdivision (a)(1), reads:  "[I]n a criminal action in which the defendant is accused of an offense involving domestic

13700 of the Penal Code." (Evid. Code, § 1109, subd. (d)(3).) As relevant here, Penal Code section 13700, defines domestic violence in subdivision (a), as abuse committed against a spouse, and defines abuse in subdivision (b), as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." As the murder of a spouse is "'the ultimate form of domestic violence,'" other uncharged acts of domestic violence by the defendant may be admissible to show a propensity to commit such a crime. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1232, 1237.)

When requested, the trial court must give a limiting instruction regarding the correct use of admissible propensity evidence. (*People v. Falsetta* (1999) 21 Cal.4th 903, 923-924.) CALCRIM No. 852 is a limiting instruction, as it explains the correct use of propensity evidence which has been admitted under Evidence Code section 1109. (See *People v. Reyes*, *supra*, 160 Cal.App.4th at pp. 251-252.) Thus, the trial court read CALCRIM No. 852 in relevant part as follows:

> "The People presented evidence that the defendant committed domestic violence that was not charged in this case. Specifically, the manner in which he drove his car on -- in the December of 2012 occurrence. Domestic violence means abuse committed against the spouse. Abuse means intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant . . . in fact, committed the uncharged domestic violence. . . . If the People have not met his burden of proof, you must disregard this evidence entirely. If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence, and based on that decision also conclude that the defendant was likely to commit murder as charged here. If you

violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder. The People must still prove the charge beyond a reasonable doubt."

## C. *Province of the jury and burden of proof*

Defendant contends that the instruction invaded the province of the jury and lessened the prosecution's burden of proof. He asserts that the instruction "stated that if the jury found the driving incident was true, that behavior constituted domestic violence." Defendant misstates the language of the instruction. We agree with respondent that the jury was not instructed that the driving incident constituted domestic violence. A statement that the People have presented evidence of a crime, does not direct the jury to find that the crime existed. (Cf. *People v. Williams* (2008) 161 Cal.App.4th 705, 710.) At most, there is an ambiguity, however, as defendant did not ask the trial court to clarify the instruction, he did not preserve a challenge on that ground. (*People v. Cole* (2004) 33 Cal.4th 1158, 1211.)

In any event, after giving the definition of domestic violence, the court instructed: "You may consider this evidence only if the People have proved by a preponderance of the evidence . . . that the defendant, in fact, committed the uncharged domestic violence." Thus, contrary to defendant's characterization of the instruction, the trial court did in fact leave it to the jury to determine whether the driving incident was true and whether it constituted domestic violence. Further, the instruction explained that *if* the jury found that defendant committed the uncharged acts, it could, but was not required to conclude defendant was disposed to commit domestic violence. This language comports with due process, as it adequately clarifies the prosecution's burden, the jury's task as finders of fact, and the correct use of propensity evidence. (See *People v. Reyes*, *supra*, 160 Cal.App.4th at pp. 251-252, relying on *People v. Reliford* (2003) 29 Cal.4th 1007, 1016 [construing substantially similar CALJIC instruction]; *People v. Loy* (2011) 52 Cal.4th 46, 72-75 [same]; *People v. Falsetta*, *supra*, 21 Cal.4th at pp. 915, 923-924 [same].)

15

In sum, the instruction neither invaded the province of the jury nor lessened the prosecution's burden of proof. We thus reject defendant's first two grounds for asserting error in giving the instruction.

### D. The driving incident as domestic violence

Defendant's third ground for claiming error giving CALCRIM No. 852 is that it improperly permitted the jury to infer "from a single uncharged, relatively innocuous driving incident" that defendant was "'likely to commit and did commit murder.'" Defendant contends that this was an unconstitutional permissive inference which violated his right to due process.

On its face, CALCRIM No. 852 comports with due process, the law of conflicting inferences, and the burden of proof. (*People v. Johnson* (2008) 164 Cal.App.4th 731, 739-740.) It correctly states the law. (*People v. Reyes*, *supra*, 160 Cal.App.4th at pp. 251-252.) Defendant contends, however, that we must look beyond the face of the instruction to find "a relationship between the permissively inferred fact and the proven fact on which it depends." (*People v. Mendoza* (2000) 24 Cal.4th 130, 180.) Defendant relies on *County Court v. Allen* (1979) 442 U.S. 140 (*Ulster County*), in which the United States Supreme Court held that a permissive inference, one the jury is free to reject, is constitutionally valid if "there is a 'rational connection' between the basic facts that the prosecution proved and the ultimate fact presumed [or inferred], and the latter is 'more likely than not to flow from' the former." (*Id*. at p. 165, fn. omitted.) Defendant contends that a single "relatively minor act at one end of the domestic violence spectrum . . . fails the 'more likely than not' test under *Ulster County*." He suggests that a rational connection between the uncharged domestic violence and an inference of propensity to commit domestic violence as serious as murder requires evidence of prior physical or sexual violence or offenses similar to the charged offense.

In *Ulster County*, the trial court had given a jury instruction based upon a New York statute which provided that the presence of a firearm in an automobile was presumptive evidence of its illegal possession by all occupants of the automobile. (*Ulster County, supra*, 442 U.S. at pp. 142-143.) After the appellate court found the statute

16

unconstitutional on its face, the Supreme Court reversed, found the statute valid on its face, and considered the facts of the case to determine whether the statute was valid *as applied* to the defendants. (*Id*. at pp.162-163.)

Here, the trial court similarly applied a statute affecting the use of evidence by instructing with CALCRIM No. 852, which applied Evidence Code section 1109 to defendant by limiting and explaining the use of propensity evidence made admissible by that section. It did so by defining domestic violence as incorporated into Evidence Code section 1109 and Penal Code section 13700, and then by permitting the jury to decide whether the offense occurred and whether it was or was not too insignificant to merit consideration. Although defendant has couched the issue as one of instructional error, his reliance on *Ulster County* and his arguments have led us to conclude that, as in *Ulster County*, defendant's claim is not truly one of instructional error, but is rather an *as-applied* constitutional challenge to Evidence Code section 1109. An as-applied constitutional challenge to a facially valid statute is one that requires an analysis of the facts of the particular case to determine whether the statute has been applied to the defendant in violation of a protected right. (*In re Taylor* (2015) 60 Cal.4th 1019, 1039.)

Defendant did not expressly direct his challenge to Evidence Code section 1109, and he does not argue here that the statute is unconstitutional on its face. Indeed, "the constitutionality of section 1109 under the due process clauses of the federal and state constitutions has now been settled." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310.) Defendant does argue that it was prejudicial error to give the instruction under *the facts of this case*, because the evidence itself was "weak" and had "negligible probative value." Defendant suggests that to support the inferences that defendant was disposed to commit domestic violence and thus likely to commit murder, there must be evidence that the abuse was repeated, that it consisted of conduct similar to the charged offense, or that it was more violent, such as causing or attempting to cause physical injury. However, as discussed, the instruction simply applied the *statutory* definition of domestic violence, which does not require such facts, and may consist solely of placing "another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or

17

another." (Pen. Code, § 13700, subd. (a); Evid. Code § 1109.)  Also, it may be a single incident where no injury was attempted.  (Cf. *People v. James* (2010) 191 Cal.App.4th 478, 483 [burglary, threats].)  Thus, it is Evidence Code section 1109 that allows an inference of propensity from what defendant considers a "relatively minor act at one end of the domestic violence spectrum."  CALCRIM No. 852 merely explains the permissive inference.  Under the reasoning of *Ulster County*, it is the *statutory* permissive inference which must be found constitutionally valid by determining whether "there is a 'rational connection' between the basic facts that the prosecution proved and the ultimate fact [inferred], and the latter is 'more likely than not to flow from' the former."  (*Ulster County, supra*, 442 U.S. at p. 165, fn. omitted.)

Evidence Code section 352 provides a safeguard from the unconstitutional application of Evidence Code section 1109, in that its weighing process ensures that such propensity evidence cannot be used in cases where its probative value would be substantially outweighed by undue prejudice, confusion of issues, or misleading the jury. (*People v. Hoover* (2000) 77 Cal.App.4th 1029, 1028-1029, citing *People v. Falsetta, supra*, 21 Cal.4th at pp. 916-918.)  """"This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence. [Citation.]""""  (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 704.)  Defendant did not object to the evidence in the trial court and does not contend on appeal that it was inadmissible.  As defendant failed to object to the evidence or to invoke Evidence Code section 352, he has forfeited appellate review of any claim that the evidence harmed him due to weak probative value.  (*People v. Valdez* (2012) 55 Cal.4th 82, 138.)  Further, as an as-applied challenge is fact-specific, a failure to object on that ground also forfeits that issue on appeal.  (See *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.)

Regardless, we reject defendant's underlying premise that erratic driving and tailgating near Laguna's car was a "relatively innocuous driving incident" that would not place a person in reasonable fear of imminent serious bodily injury.  Recklessly driving a vehicle close to another in an intimidating manner can result in a conviction of assault with a deadly weapon (*People v. Wright* (2002) 100 Cal.App.4th 703, 705-706), which

does not require an intent to apply physical force or even a subjective awareness of the risk. (*People v. Aznavoleh* (2012) 210 Cal.App.4th 1181, 1186-1187.) The application of physical force need only be reasonably foreseeable under an objective standard. (*Id*. at p. 1189.) The driving described here by Laguna was not merely reckless driving, rather defendant intentionally drove in an aggressive and intimidating manner for 15 minutes, coming close to the car occupied by Esperanza and her friends, and alternating between tailgating and blocking the car. An imminent collision and resulting bodily injury were reasonably foreseeable and caused Esperanza to be afraid. Such circumstances strongly suggest that Esperanza and her friends were at risk of imminent serious bodily injury and that Esperanza was in reasonable apprehension of that risk; thus, if defendant had made the appropriate objection in the trial court, it is unlikely that the objection would have been sustained, or that we would find that to be an abuse of discretion.[6]

### E. No prejudice

As CALCRIM No. 852 correctly stated the law and substantial evidence supported it, the trial court did not err in reading it to the jury. (See *People v. Falsetta*, *supra*, 21 Cal.4th at p. 923.) We also conclude that defendant suffered no prejudice from the instruction. If there were error in giving a propensity instruction it is reviewed for prejudice under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 837, which asks whether it is reasonably probable that the defendant would have obtained a more favorable result absent the error. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1182; see Cal. Const., art. VI, § 13.) Under the *Watson* test, it is defendant's burden to demonstrate prejudice by establishing "a reasonable probability that error affected the trial's result." (See *People v. Hernandez* (2011) 51 Cal.4th 733, 746.)

Arguing that a more favorable result would have been likely without the instruction, defendant reasons as follows: the propensity evidence was so weak that but for the instruction, the jury would have been less inclined to view him as a person likely

---

[6] As we have found no error, we do not reach defendant's claim that the trial court violated its duty of absolute impartiality in giving the instruction. In any event, in his reply brief defendant denied any claim of judicial bias.

19

to commit premeditated murder, which in turn would have lessened the very damaging impact of the video recording of the shooting. Defendant's logic fails, because CALCRIM No. 852 is a *limiting* instruction, and thus inured to defendant's benefit. (See *People v. Reyes*, *supra*, 160 Cal.App.4th at p. 252.) Without the instruction, the jury would have heard the evidence, but would not have been told: the uncharged domestic violence must be disregarded unless proven by a preponderance of the evidence, or that the jury was not required to conclude that defendant was disposed to commit domestic violence or likely to commit murder, or that any such conclusion was insufficient by itself to prove the defendant guilty of murder, but only one factor to consider along with all the other evidence, or that the People were still required to prove the charge beyond a reasonable doubt.

We conclude that if the jury had been given a free rein to use the propensity evidence in any manner it might think appropriate, it is not reasonably probable that defendant would have obtained a more favorable result. Indeed, for the same reason, if we were to apply the stricter constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24, we would conclude beyond a reasonable doubt that the alleged error was harmless.

## II. Pinpoint instruction

### A. *Underlying legal principles*

Defendant contends that the trial court erred in refusing his requested pinpoint instruction. "A criminal defendant is entitled, on request, to instructions that pinpoint the theory of the defense case. [Citations.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1142.) "The court may, however, 'properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation].' [Citation.] (*People v. Burney* (2009) 47 Cal.4th 203, 246.)

In this case, the pinpoint instruction was similar to CALCRIM No. 570, which the trial court read without modification and in relevant part as follows:

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

### B. Verbal provocation

Defendant's requested pinpoint instruction included the following language: "No specific type of provocation is required to generate the passion necessary to constitute heat of passion, and verbal provocation may be sufficient."

Defendant first contends that without the additional language in his proposed pinpoint instruction, CALCRIM No. 570 created an ambiguity by qualifying the phrase, "no specific type of provocation is required," with the words, "slight or remote provocation is not sufficient." On the contrary, by omitting the slight or remote qualification, defendant's proposed instruction would have created confusion by suggesting that *any* verbal provocation would be sufficient. The trial court properly refuses a pinpoint instruction that is potentially confusing. (*People v. Burney, supra*, 47 Cal.4th at p. 246.)

Defendant also contends that the trial court erred in finding the verbal provocation language in his pinpoint instruction to be unnecessary and cumulative. As CALCRIM No. 570 made it abundantly clear to the jury that "no specific type of provocation is required," there was no need to specify any type of provocation. Where nothing precludes the jury from finding that words alone can be sufficient provocation, it is not error to refuse to give such a special instruction, as it would be duplicative. (*People v. Gutierrez, supra*, 28 Cal.4th at pp. 1144-1145.) Further, the refusal to give an instruction

21

which duplicates the standard jury instruction on the point is harmless. (*Ibid.*) We find no error.

### C. *Honest but mistaken belief*

The pinpoint instruction also included the following language: "The honest but mistaken belief in the existence of an event that, if true, would ordinarily provoke a reasonable man, may constitute provocation of such a nature to arouse heat of passion." The court found the "mistaken belief" language irrelevant, as the jury would not be instructed that a provocative event must be true. As the trial court did not instruct the jury that the provocative event could be true or false, it was unnecessary to explain that the disclosure must have been believed if false. (Cf. *People v. Gutierrez, supra*, 28 Cal.4th at pp. 1144-1145.)

Defendant contends that his belief was relevant because jurors might not have understood that an honest but mistaken belief can amount to sufficient provocation. This mistaken belief theory, which defendant calls the "'honest but false belief' rule," incorrectly states the law. "The provocation which incites the defendant to homicidal conduct in the heat of passion [may] be . . . conduct *reasonably* believed by the defendant to have been engaged in by the victim. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59, italics added.) And "[a] sudden disclosure of an event, where the event is recognized by the law as adequate, may be the equivalent of the event itself, even if the disclosure is untrue. (*State v. Yanz* (1901) 74 Conn. 177.) [W]here there is a reasonable belief in the information disclosed, the provocation is adequate. (*People v. Logan* (1917) 175 Cal. 45, 49.)" (*People v. Brooks* (1986) 185 Cal.App.3d 687, 693-695.) It follows that if a defendant is mistaken regarding the provocative event, his belief must be reasonable. However, defendant cites no authority using the word "honest" in relation to defendant's belief, and we have found none.[7] The only other subjective mental state required for heat

---

[7] An honest belief is the subjective mental state required for voluntary manslaughter based upon imperfect self-defense, which is committed with the honest but unreasonable belief that killing is necessary to defend against imminent peril. (See *People v. Elmore*

of passion is that defendant act under the actual influence of a strong passion which can be any violent, intense, high-wrought or enthusiastic emotion other than revenge. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139.)  Defendant's "'honest but false belief' rule" would have injected a new subjective component into the law of voluntary manslaughter based on heat of passion.

Moreover, we observe that the mistaken belief language was not supported by substantial evidence.  Defendant did not testify that he believed any of Esperanza's hurtful statements.  Indeed, defendant testified that he did not believe Esperanza when she claimed in their exchange of text messages to have had an abortion.  Defendant testified that he believed Esperanza loved him when they married, and did not think her motive to marry was to obtain her immigration documents.  Defendant did not testify that he believed her claim of infidelity.  As defendant has pointed to no evidence of any belief, whether honest, mistaken, reasonable, or unreasonable, the mistaken belief language was properly rejected.  (See *People v. Burney, supra*, 47 Cal.4th at p. 246.)

Finally, nothing in the instructions they were given precluded the jury from finding that Esperanza's disclosure that she had an abortion or had become pregnant by another man, whether true or untrue, amounted to provocation "'sufficient to arouse the passions of the ordinarily reasonable man.'  [Citation.]" (*People v. Steele* (2002) 27 Cal.4th at 1230, 1252-1253.)  Thus, the omission of any instruction regarding defendant's belief was harmless.  (Cf. *People v. Gutierrez, supra*, 28 Cal.4th at pp. 1143-1145.)

## III.  Cumulative error

Defendant's final contention is that the cumulative effect of the asserted errors requires reversal.  "As we have found no substantial error in any respect, this claim must be rejected."  (*People v. Butler* (2009) 46 Cal.4th 847, 885.)

---

(2014) 59 Cal.4th 121, 134.)  Defendant appears to conflate the two theories of voluntary manslaughter.

# DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT